UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VALERIE STRINGFELLOW, as Personal
Representative to the ESTATE OF ALFRED
STRINGFELLOW, Deceased,

      Plaintiff,                        CIVIL ACTION NO. 03 CV 75188 DT

      v.                                DISTRICT JUDGE VICTORIA A. ROBERTS

OAKWOOD HOSPITAL AND           MAGISTRATE JUDGE VIRGINIA MORGAN
MEDICAL CENTER, a Michigan
Non-Profit Hospital Corporation,
JOHN C. OWENS, M.D.,
Jointly and Severally,

      Defendants.
_____/

**OPINION ON MOTION TO COMPEL**

This matter is before the court on plaintiff's motion to compel discovery in this civil action alleging violation of a federal statute and supplemental state malpractice claims. The issue before the court is whether plaintiff may discover the hospital's Emergency Policies, as well as Peer Review documents. Oral argument was held before the magistrate judge and the matter taken under advisement. For the reasons stated in this memorandum opinion, IT IS ORDERED that the motion is GRANTED IN PART AND DENIED IN PART. IT IS FURTHER ORDERED that the hospital shall provide the Emergency policies but may withhold Peer Review documents.

- 1 -

The court's jurisdiction is based on 28 U.S.C. § 1331, federal question jurisdiction. Plaintiff, personal representative of decedent, alleges against the hospital a violation of the Emergency Medical Treatment and Active Labor Act, (EMTALA) 42 U.S.C. §1395(d)(d). Although it appears that plaintiff also seeks to name the treating physician as to this claim, the physician is not a proper party to an EMTALA claim.[1]  Plaintiff also alleges state medical malpractice claims against the treating physician, which are before the court pursuant to its supplemental jurisdiction, 28 U.S.C. §1367.  Plaintiff alleges that the decedent's death was caused by the hospital's negligence and the physician's malpractice and seeks money damages.

In the instant motion, plaintiff sought certain discovery.  Many of the issues have been resolved and the resolutions are set forth in the parties' List of Unresolved Issues previously filed.  This opinion is directed to the unresolved issues as set forth below.

*FACTUAL BACKGROUND:*

Plaintiff is the personal representative of Alfred Stringfellow.  According to medical records attached to the pending motion for summary judgment and the parties briefs here,  Mr. Stringfellow, age 51 or 52,  was seen at Oakwood Hospital on January 3, 2002 at 4:00 am in the emergency department.  This was apparently his first and only medical visit there.  He was

---

[1] Although plaintiff states in the motion that she brings an EMTALA claim against Dr. Owens, the treating physician, that claim is only cognizable against the hospital.  See, *Delaney v. Cade*, 986 F.2d 387, 393-94 (10th Cir. 1993); *Brenord v. Catholic Medical Center*, 133 F. Supp. 2d 179, 185-186 (E.D. N.Y., 2001)(collecting cases); *Deron v. Wilkins*, 879 F. Supp. 603, (S.D. Miss. 1995).

examined, given tests, provided medication, and released several hours after initial presentation. He died the next day, January 4, 2002.

At the time Mr. Stringfellow arrived at the hospital about 11:38 p.m. on January 3, 2002, he reported having chest pain (4 out of 10 in intensity) for the previous 35 minutes, non-radiating with mild shortness of breath.  He also complained of nausea and worsening of the pain by change in position.  His history included smoking one pack of cigarettes a day, drinking one pint of vodka a day, and hypertension.  He was seen in the emergency room by defendant Dr. John C. Owens, M.D.  He was given a number of lab tests and a chest x-ray.  The lab results were positive for cocaine. (Lab 1/4/02 0055 a.m.)  His blood alcohol was .21.  His lungs were functioning, his thought process was normal, and he did not have back pain.  The chest x-ray was essentially normal but showed an enlarged heart and the EKG showed left ventricular hypertrophy, both consistent with history of hypertension.  Confronted with the lab results, Mr. Stringfellow admitted to recent cocaine ingestion and subsequently to a 20-year history of cocaine abuse.  The nurse reported at 2:50 a.m. that he seemed very anxious.  He was seen by the certified social worker regarding the substance abuse.  In his conversation with her, he denied hallucinations, suicide and homicidal ideation and was amenable to inpatient substance abuse treatment.  His vital signs had stabilized and he was referred for the inpatient substance abuse treatment and given Ativan for anxiety.  He was no longer complaining of chest pain, and was released at 4:00 a.m. with instructions to follow up in 24 to 48 hours and to stop drinking.  He was picked up by his sister and driven home. (Ex. B to Defendants' Motion for Summary Judgment)  The discharge diagnosis was acute chest pain.   No diagnosis was made of any

problem with the thoracic aneurysm.  (Affidavit of Merit by Philip Leavy)   Several hours later, at approximately noon, Mr. Stringfellow's wife called police to report that he had died.  He was found face down on a sofa in the basement.  The medical examiner opined that plaintiff died of "a ruptured aortic dissection due to cocaine abuse and high blood pressure."  (Ex. B to defendant's motion for summary judgment, D/E 22-1)

*LEGAL BACKGROUND:*

The EMTALA statute was passed by Congress to address the problem of "patient dumping," a practice whereby hospitals either send a patient in need of medical care to another facility (most often a public hospital) or simply turn the patient away due to the patient's inability to pay.  See, McKitrick, Note: The Effect of State Medical Malpractice Caps on Damages Awarded under the Emergency Medical Treatment and Active Labor Act (42 U.S.C. §1395DD), 42 CLVSLR 171 (1994).  Although all of the legislative history is directed towards concerns about indigent and uninsured patients, the statute's language is broader.  The statute provides by its terms that "if any individual . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capacity of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists."  The term "appropriate medical screening" is not defined.  Most courts that have looked at this issue have determined that the measure is not the outcome of the examination, but whether or not the examination performed was considered standard procedure by the hospital.  In such

respect, the standard would be a subjective one. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 272 (6th Cir. 1990)

The EMTALA statute also provides that there be "such further medical examination and such treatment as may be required to stabilize the [emergency] medical condition [prior to transfer]." 42 U.S.C. 1395 dd(b)(1)(A). Transfer also includes a discharge. See, 42 U.S.C. §1395dd(e)(4). The term "to stabilize" is defined by EMTALA as meaning, "with respect to an emergency medical condition, . . .[a hospital must] provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility. 42 U.S.C. § 1395dd(e)(3)(A), *Harry v. Marchant*, 291 F.3d 767, 770-771 (11th Cir. 2002).

The majority of courts hold that it is not necessary in the screening context for plaintiff to show an improper motive–i.e., an intent not to treat uninsured patients, and the Supreme Court has also held with respect to the stabilization requirement, that no improper motive need be shown. *Roberts v. Galen of Virginia*, 525 U.S. 249, 119 S.Ct. 685 (1999).

## DISCOVERY ISSUES

*Emergency Policies and Related Requests*

Here, plaintiff seeks in request #4 the hospital's Emergency Department policies and procedures in effect on January 3 and 4, 2002. These are discoverable because they are relevant and likely to lead to admissible evidence, assuming an emergency medical condition. They would show whether appropriate screening was done and whether the emergency procedures

followed were standard hospital procedures. In addition, these policies may (or may not) discuss a requirement for stabilization. Thus, this request is granted.

Plaintiff also seeks any "quality improvement plan for the Emergency Department" is both ambiguous and irrelevant. It is the emergency procedures in effect on the day Mr. Stringfellow was seen, not whether they might be subject to improvement that govern the EMTALA action. The request is denied.

Plaintiff seeks the hospital's medicare provider agreement (presumably as it was in effect on January 3, 2002). This would be relevant if the hospital claimed that it was not a participating provider under EMTALA. The court does not understand this issue to be in dispute. Plaintiff has not provided any other reason why this would be relevant or likely to lead to the discovery of admissible evidence. Thus, the request is denied.

*Peer Review Materials*

Plaintiff also seeks depositions and materials related to the hospital's Peer Review procedures. Plaintiff originally sought minutes and notes from the medial staff meetings for the twelve month period after January 4, 2002. Following defendant's objections, plaintiff withdrew that request but continues to seek minutes from "any medical staff meeting and any Morbidity/Mortality conference as it relates to Alfred Stringfellow on or around January 4, 2002." Plaintiff also seeks to have identified all individuals on the M&M committee who were present so to identify potential deponents. Defendant alleges that such information is protected by Michigan's Public Health Code and Peer Review privilege. It is barred from discovery by state statute.

Discovery in federal courts is generally governed by the Federal Rules of Civil Procedure regardless of whether federal jurisdiction is based on a federal question or diversity of citizenship. *Atteberry v. Longmont United Hospital*, 221 F.R.D. 644 (D. Colo., 2004); *Everitt v. Brazzel*, 750 F. Supp. 1063, 1065 (D.Colo. 1990). "Where federal law provides the governing substantive law in a lawsuit, the federal common law of privileges will govern." *Everitt*, 750 F.Supp. at 1066. Federal law provides the rule of decision only in the EMTALA claim, not the malpractice claims. Federal Rule 26 provides that a party may obtain discovery regarding any matter not privileged which is relevant to the subject matter involved in the pending action . The information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Thus, there are two prongs to the test as to whether the documents should be produced: (1) is the information relevant to the subject matter and (2) is it otherwise privileged?

Plaintiff's position is that it does not need and is not requesting the documents for the supplemental malpractice claim.[2] Plaintiff states it is seeking the documents only for the EMTALA claim, to which the state statute barring discovery is inapplicable. Defendant argues that the documents are not relevant to the EMTALA claim. Plaintiff argues that discovery of these documents would be "crucial in determining whether Mr. Stringfellow's rights under EMTALA had been violated and it would be important to find out what each committee

---

[2]But for the claim of an EMTALA violation, that is, in an ordinary medical malpractice action in state court, no discovery of this group of documents could be had.

member's [the members of the M & M committee] knowledge entails regarding Mr. Stringfellow's care." (List of Unresolved Issues)

After careful consideration, the court is not persuaded that the documents would be relevant to the subject matter of the EMTALA claim. They are not likely to lead to admissible evidence in the EMTALA claim because EMTALA is not intended to be a federal malpractice action. *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002). Under EMTALA, patients diagnosed with an "emergency medical condition" or "active labor" must either be treated or be transferred in accordance with EMTALA. *Burditt v. US.Dept of HHS*, 934 F.2d 1362, 1367 (5th Cir. 1991). The sole issue in this EMTALA claim is whether Mr. Stringfellow was diagnosed with an emergency condition, a fact which can be established from the medical records, and if so, whether the hospital transferred (i.e. discharged) him when he was not stable. A hospital's duty under EMTALA does not arise until and unless the hospital detects an emergency medical condition. *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1254 (9th Cir. 2001). Here, plaintiff's own expert has submitted an affidavit with the complaint that states that the hospital did not diagnose any emergency medical condition and is therefore guilty of negligence.

EMTALA is not a guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of the emergency room screening. *Id*., citing *Baber v. Hosp. Corp. of America*, 977 F.2d 872, 879 (4th Cir. 1992). The threshold test is whether the hospital should known but whether it <u>had actual knowledge</u> of an emergency condition. *Id*. at 1256-1257. This determination can be made by looking at the medical record and taking depositions of the persons on the scene. The hospital's failure to diagnose any underlying cause of decedent's

symptoms or to detect an emergency condition cannot serve as the basis for a violation of EMTALA's stabilization requirements. *Id.*, discussing *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 (9th Cir. 1995). Any post-mortem conference designed to address whether staff should have known of some underlying condition or should have diagnosed something different may be relevant to a malpractice claim, but not to the EMTALA claim. Because liability under EMTALA attaches, *inter alia*, only if the hospital is shown to have known of the existence of a necessary fact, e.g. that the patient suffered from an emergency medical condition, there is no relevance to document discussing what they failed to know. *St. Anthony Hospital v. HHS*, 309 F.3d 680, 705 (10th Cir. 2002), citing *Urban v. King*, 43 F.3d 523, 525-26 (10th Cir. 1994).

With respect to stabilization, the requirement to stabilization arises only after diagnosis of an emergency medical condition. Interpreting EMTALA to require stabilization treatment after diagnosis of an emergency condition is consistent with the terms of the statute. Requiring stabilization outside the context of a transfer [or discharge] raises questions not answered by Congress, such as: when the duty to provide stabilization treatment terminates; if treatment is prolonged and transfer is not imminent, how long treatment must be provided; and when the temporal delay between a determination of an emergency medical condition and the initiation of treatment constitutes a violation of a duty to provide stabilization treatment. *Harry v. Marchant*, 291 F.3d at 772, note 1. Such a broad reading would make the EMTALA statute one for federal malpractice, a position totally rejected by the case law. Transfer is defined by the statute to be "the movement (including the discharge) of an individual outside of a hospital's facilities. 42 U.S.C. §1395dd(e)(4). Here, Mr. Stringfellow clearly made it out of the hospital and to his home

without incident, though what happened after that is unclear.  Even if there were to have been a diagnosed emergent condition, it does not appear that the materials requested would be relevant to the stabilization determination.  The medical records themselves would show whether or not he was stable.

Courts not looking at relevance to the subject matter of the claim have occasionally granted discovery of the peer review materials.  Federal courts are traditionally reluctant to recognize new privileges because they contravene the fundamental principle that the public has a right to every man's evidence.  If the documents were relevant to the subject matter of EMTALA and federal common law were to apply to the EMTALA claim, courts would generally look to state law.  If so, they would observe that the Michigan legislature had barred disclosure of the peer review documents in discovery and should use that as a guide.  However, some courts have held that there is no basis for recognizing a medical peer review privilege or medical risk management privilege.  *Sonnino v. University of Kansas Hospital Authority*, 220 F.R.D. 633, 644 (D. Kan. 2004) and so have ordered discovery.

However, here, where plaintiff's own expert has opined that no emergent condition was diagnosed, documents relevant to Peer Review of that determination cannot be said to be relevant to the EMTALA failure to stabilize claim.  Thus, the request is denied.  The documents need not be disclosed.

SO ORDERED.

                                         s/Virginia M. Morgan  
                                         VIRGINIA M. MORGAN  
                                         UNITED STATES MAGISTRATE JUDGE

Dated:   October 21, 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALERIE STRINGFELLOW, as Personal
Representative to the ESTATE OF ALFRED
STRINGFELLOW, Deceased,

        Plaintiff,                  CIVIL ACTION NO. 03 CV 75188 DT

        v.                           DISTRICT JUDGE VICTORIA A. ROBERTS

OAKWOOD HOSPITAL AND        MAGISTRATE JUDGE VIRGINIA MORGAN
MEDICAL CENTER, a Michigan
Non-Profit Hospital Corporation,
JOHN C. OWENS, M.D.,
Jointly and Severally,

        Defendants.
_____/

**OPINION ON MOTION TO COMPEL**

---

**Proof of Service**

The undersigned certifies that a copy of the foregoing opinion on motion to compel was served on the attorneys of record by electronic means or U.S. Mail on October 21, 2005.

                                    s/Jennifer Hernandez
                                    Case Manager to
                                    Magistrate Judge Morgan